COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present: Judges Petty, Beales and Chafin
Argued at Richmond, Virginia


GEORGE WESLEY HUGUELY, V

v.      Record No. 1697-12-2

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE RANDOLPH A. BEALES
MARCH 4, 2014


FROM THE CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE
Edward L. Hogshire, Judge

Paul D. Clement (Craig S. Cooley; Bancroft PLLC; Craig S. Cooley,
P.L.C., on briefs), for appellant.

Leah A. Darron, Senior Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


A jury convicted George Wesley Huguely, V, of second-degree murder and grand

larceny, in violation of Code §§ 18.2-32 and 18.2-95. Before this Court, Huguely now appeals

only his second-degree murder conviction.[1] This Court granted the following assignments of

error raised in Huguely's petition for appeal:

> I. The circuit court violated Mr. Huguely's right to counsel under
> the Sixth Amendment and the Virginia Constitution by forcing him
> to proceed with trial in the absence of his retained counsel of
> choice.
>
> II. The circuit court violated Mr. Huguely's right to a trial by a fair
> and impartial jury under the Sixth Amendment and Virginia
> Constitution by:

---

[1] Initially, Huguely appealed both convictions. However, he moved to withdraw the
appeal of the grand larceny conviction on November 26, 2013. This Court granted Huguely's
motion. See Huguely v. Commonwealth, Rec. No. 1697-12-2 (Va. Ct. App. Dec. 3, 2013).
Therefore, this Court will consider Huguely's assignments of error only as they pertain to his
appeal of the second-degree murder conviction because Huguely has now withdrawn his appeal
of the grand larceny conviction.

A. Refusing to allow the defense to ask questions during *voir dire* that were directly relevant to whether prospective jurors could remain impartial.

B. Refusing to strike for cause a number of jurors whose answers during *voir dire* raised serious doubts about their ability to remain impartial.

III. The circuit court did not adequately instruct the jury about the meaning of "malice" under Virginia law.[2]

For the following reasons, we affirm Huguely's conviction for second-degree murder.

I. BACKGROUND[3]

A. THE EVENTS OF MAY 2-3, 2010

On the night of Sunday, May 2, 2010, at about twenty minutes before midnight, Huguely walked the short distance from his apartment building on 14th Street in Charlottesville to another apartment building, also on 14th Street, where Huguely's former girlfriend, Yeardley Love, resided. Huguely and Love were both nearing graduation from the University of Virginia, and both played lacrosse there. They had dated "[o]n and off" since their first year at the university, according to the trial testimony of Caitlin Whiteley, one of Love's roommates. The record establishes a tumultuous relationship between Huguely and Love that deteriorated acrimoniously during the spring semester of 2010. Whiteley testified that, "towards the end of the [academic] year," the relationship "was off, mainly."

---

[2] Huguely actually raised eight assignments of error in his petition for appeal to this Court. An appeal was not granted on four of these assignments of error – including an assignment of error challenging the sufficiency of the evidence supporting the jury's verdict. Therefore, we do not address in this opinion the assignments of error for which an appeal was not granted.

[3] On appeal, we view the evidence "in the light most favorable to the Commonwealth, as we must since it was the prevailing party" in the trial court. Riner v. Commonwealth, 268 Va. 296, 330, 601 S.E.2d 555, 574 (2004). The only exception to this settled rule here concerns Huguely's assignment of error challenging the refusal of his proposed jury instruction. On that issue alone, we must consider the evidence in the light most favorable to Huguely. See, e.g., Hartigan v. Commonwealth, 31 Va. App. 243, 257, 522 S.E.2d 406, 412 (1999).

- 2 -

Love did not invite Huguely to her apartment on the night of May 2. In fact, Whiteley testified that Love was asleep in her bedroom when Whiteley left the apartment at about 10:50 p.m. Huguely arrived just under an hour later. After entering Love's apartment, which was apparently unlocked, Huguely kicked open Love's locked bedroom door. No one else witnessed what occurred next. However, Anna Lehmman, a resident of the apartment directly below Love's, testified that she heard a "very, very loud" sound from above at about 11:50 p.m. Lehmann explained that it sounded like "slamming the trunk [of a car], that that's how loud it was, if you really slammed it." Moments later, Lehmann heard footsteps descending the stairs of the apartment building and then observed a man (later identified as Huguely) walk away outside.

Whiteley returned to the apartment shortly after 2:15 a.m. on Monday, May 3, 2010. Whiteley went to Love's bedroom to check on her – not noticing at first the hole in the bedroom door (that Huguely had created when he kicked in the bedroom door). According to Whiteley, Love was positioned "face down in her pillow" and "her hair was all messed up." Whiteley moved Love's hair to the side, but Love made no response. Whiteley saw blood stains on Love's sheets and pillow case. Then Whiteley noticed that one of Love's eyes was very badly damaged and that there were many cuts to Love's face. Whiteley called out for Philippe Oudshoorn, a friend who had accompanied Whiteley back to the apartment, and they dialed 911.

Finding no signs of a pulse from Love, Oudshoorn followed the emergency operator's instructions to move Love to the floor and attempt CPR. Police officers arrived moments later, followed by the paramedics, who arrived at 2:26 a.m. The paramedics spent twenty-five minutes trying to resuscitate Love. During that entire time, however, Love never showed any signs of life. The medical examiner's autopsy report that followed Love's death concluded that the cause of death was blunt force injury to Love's head.

Whiteley testified that she told the police about Love's relationship with Huguely, specifically mentioning prior incidents when Huguely had either acted violently or threatened Love with violence. For example, Whiteley was aware of an incident on February 27, 2010 in Huguely's bedroom where Love was seen struggling to free herself from Huguely – whose arms were wrapped around Love's neck so tightly that Love was being choked. Several witnesses saw Love – in a panicked state and holding her throat – run out of Huguely's apartment. Whiteley testified that, when Love came home to their apartment, Love was "hysterical" and "was crying and visibly shaken and upset." Whiteley had never seen Love like that before.

Huguely wrote Love a letter apologizing for the way he treated her on February 27, 2010. This letter was admitted into evidence at Huguely's trial and states, in pertinent part, "Yeardley, I cannot describe how sorry I am for what happened this past weekend. I am horrified with the way I behaved and treated you. I'm scared to know that I can get that drunk to that point where I cannot control the way I behave or act." Huguely's letter to Love also states, "I'm horrified to think that I was using physical force to keep you in my room. I'm so sorry." The letter concludes, "I'm so sorry again and hope to talk with you when you feel you can. I can assure you though that I will never act as I did that Saturday night. I'm sorry again!! Love, George."

Despite the sentiments Huguely expressed in this letter, his relationship with Love continued to deteriorate as the spring semester of 2010 progressed. Notably, following a heated argument between Love and Huguely that occurred on April 27, 2010, the two engaged in a series of angrily worded emails, copies of which were received into the trial evidence. In particular, on April 30, 2010, he emailed her, stating:

> That is so so f***ed up on so many levels. I should have killed
> you. I'm still in utter disbelief at everything that has happened
> recently and how u handle this.

Based on the testimony of several of his teammates from the men's lacrosse team, Huguely had been drinking alcohol heavily the majority of the day of May 2, 2010 – since at least 9:30 a.m. Huguely was noticeably intoxicated at a reception following the lacrosse team's annual golf tournament that afternoon. Dinner at a restaurant with Huguely's father and two lacrosse teammates was cut short because of Huguely's drunken behavior. According to one of those teammates, William Thompson, "[I]t just got to the point where we just wanted to get out of there, out of the public." Huguely urinated in public outside of the restaurant. Huguely's roommate, Kevin Carroll, testified that Huguely was drunk when Huguely returned to their apartment at 10:30 p.m.

Carroll and another lacrosse teammate, Kenneth Clausen, left the apartment at about 11:40 p.m. and were gone for about fifteen or twenty minutes. Huguely was not there when they returned. Huguely came back at about 12:15 a.m. Clausen testified, "I looked at him for a bit. I noticed there was a change in his demeanor, kind of a blank stare on his face." Huguely then lied about where he had been – claiming he had been drinking with a lacrosse teammate who Carroll and Clausen knew was studying at the time. Clausen testified:

> I said, George, what's wrong with you? He looked at me and said, nothing. He said that there was nothing wrong. I asked him---I continued to look at him and observe him. I asked him two more times. I said, George, what's wrong with you? Got no response.

Huguely was at his apartment when the police arrived at 7:30 a.m. on Monday, May 3. During an interview with two detectives at the police station that morning, Huguely admitted going to Love's apartment the night before because he was "so pissed" that she would not talk to him and kicking a hole in the bedroom door to gain access to her bedroom – but he denied killing

her.  Huguely also admitted taking Love's laptop computer as "collateral" and later throwing the computer in a dumpster.[4]

## B.  HUGUELY'S TRIAL

A grand jury returned a six-count indictment charging Huguely with, *inter alia*, first-degree murder under Code § 18.2-32 and robbery under Code § 18.2-58.[5]  By this time, the case had received considerable attention in the media, in the Charlottesville area, and at the University of Virginia.  The prospective jurors were directed to complete a nine-page questionnaire that addressed, among other topics, the prospective jurors' exposure to opinions in the case through the media and through family, friends, and co-workers.  *Voir dire* of the prospective jurors spanned the first three days of the trial.  Huguely's trial ended up lasting over two weeks – from February 6, 2012 until February 22, 2012.  From the beginning of the Commonwealth's case on February 8, 2012 until the conclusion of the trial, nearly sixty witnesses were examined.

Huguely was represented by two defense attorneys – Rhonda Quagliana, Esq., and Francis McQ. Lawrence, Esq., both of whom were privately retained by Mr. Huguely.  Neither Ms. Quagliana nor Mr. Lawrence was designated as lead counsel, although each attorney assumed different responsibilities during the trial.  In particular, it was Ms. Quagliana's

---

[4] A video recording of Huguely's interview was admitted into evidence at trial.  Briefly summarized, Huguely told the detectives during the interview that Love "freaked out" and "became" aggressive when Huguely entered her bedroom.  Huguely admitted that he grabbed Love and "shook her a little bit" before a struggle ensued on the bedroom floor.  Huguely claimed that Love's nose started bleeding at that time.  Huguely said that he stood up and "tossed" Love on her bed before leaving the apartment.

[5] In separate indictments, the Commonwealth alleged that Huguely committed first-degree murder by premeditation and in the commission of robbery.  The jury acquitted Huguely of both of these first-degree murder counts and instead convicted him of the lesser-included offense of second-degree murder (which requires a finding of malice but not premeditation).  The jury also found Huguely not guilty of robbery and of two felony charges involving breaking and entering.

- 6 -

responsibility to examine two medical experts, Jan Leestma, M.D. and Ronald Uscinski, M.D., whose testimony was offered to contradict the Commonwealth's theory that Love's death was caused by blunt force trauma to the head. As a matter of trial strategy, Ms. Quagliana and Mr. Lawrence decided that this expert testimony would be more effective if Dr. Leestma and Dr. Uscinski testified in succession, one after the other.

On Wednesday, February 15, 2012, the Commonwealth concluded its case-in-chief. The defense's case-in-chief then began that day with Ms. Quagliana's examination of Dr. Leestma – the last witness of the day. However, Ms. Quagliana became very ill due to a stomach virus before the trial proceedings resumed on Thursday, February 16. Ms. Quagliana could not attend court on February 16, and, therefore, she could not examine Dr. Uscinski as the defense had anticipated.

Due to Ms. Quagliana's illness, the trial judge decided to excuse the jury for the entire day on February 16. Mr. Lawrence alone addressed some matters with the trial judge and the prosecutor, including the instructions to be given to the jury, outside the presence of the jury.

On the morning of Friday, February 17, Ms. Quagliana remained too ill to attend court. Mr. Lawrence indicated that the nature of Ms. Quagliana's illness was "a day-to-day thing" and that he was "optimistic" that she would be able to return to court the following day. Mr. Lawrence stated that he was not prepared to examine Dr. Usckinski and also asserted that it would be unfair to Huguely if Dr. Uscinksi's examination proceeded without Ms. Quagliana. The trial judge asked Mr. Lawrence, "Now, today what can you accomplish from your perspective?" Mr. Lawrence replied, "Judge, we have other witnesses today that we are prepared to put on. They are all back there waiting and we're ready to go." The trial judge accepted

Mr. Lawrence's offer to examine those defense witnesses on the morning of February 17.[6] The trial judge also indicated that, if Ms. Quagliana could not return to court by the afternoon to examine Dr. Uscinski, then the jury would likely need to be excused for the remainder of the day.

Following a short recess, however, Mr. Lawrence actually moved for a continuance until Ms. Quagliana was able to return to court. According to Mr. Lawrence, Huguely did not feel comfortable with the taking of any evidence until Ms. Quagliana returned. Mr. Lawrence acknowledged that "the Commonwealth has pointed out the stress on the people on [the Commonwealth's] side of the courtroom by these delays and we have sympathy for that" problem. However, Mr. Lawrence added, "[W]e haven't looked at the case law on [the issue of] if you have two lawyers, do you have the right to both of them? I think you probably do, so [Huguely] objects to proceeding at all until he has his full defense team." In response, the trial judge asked Mr. Lawrence, "Well, do you feel competent proceeding this morning? I guess you did or you wouldn't be offering to do it, right?" Mr. Lawrence replied, "That's correct." The trial judge denied the motion for a continuance, commenting that Mr. Lawrence was "about as capable as any lawyer in the town to handle something like this, and I have no doubt that you're capable of handling these witnesses today in competent fashion."

Mr. Lawrence then examined those defense witnesses whom he had initially offered to examine – but not Dr. Uscinski. When the trial judge learned that Ms. Quagliana was unable to return to court at all that day, the trial judge excused the jury for the remainder of the day.[7] On

---

[6] One of these witnesses was an expert in biomechanical analysis. However, it appears from the record that he was not an expert witness that Ms. Quagliana was supposed to examine.

[7] Thus, during the course of Ms. Quagliana's illness (which kept her out of court on February 16 and 17), the trial judge excused the jury from hearing testimony at all times – except for the morning of February 17, when Mr. Lawrence examined the witnesses whom he had told the trial judge he was prepared to examine (and had actually offered to examine).

the next morning, Saturday, February 18, the trial resumed.  Ms. Quagliana was in court, and she examined Dr. Uscinski that morning.[8]

At the conclusion of all of the evidence and closing arguments, the jury found that Huguely was guilty of second-degree murder and grand larceny.  The trial judge denied Huguely's motions to set aside the verdict, and Huguely appealed to this Court.

## II. ANALYSIS

### A. ASSIGNMENT OF ERROR I – RIGHT TO COUNSEL

In Assignment of Error I, Huguely argues that the trial judge committed reversible error under the Sixth Amendment of the United States Constitution and under the Virginia Constitution[9] by denying Huguely's motion for a continuance on the morning of Friday, February 17, 2012, when Ms. Quagliana (one of Huguely's two retained attorneys) remained too ill to attend court.  Huguely argues that the United States Supreme Court's decision in United States v. Gonzalez-Lopez, 548 U.S. 140 (2006), requires that this Court grant him a new trial.

---

[8] At the end of the day on Friday, February 17, Mr. Lawrence asked the trial judge not to resume the trial until the following Wednesday, February 22.  (The record establishes that one of the jurors was scheduled to be out of town on Sunday, February 19, that Monday, February 20 was a state holiday, and that Tuesday, February 21 was reserved for grand jury proceedings.) The trial judge denied Mr. Lawrence's request.  Contrary to Huguely's suggestion on appeal, it is unknown whether the trial judge actually would have required Mr. Lawrence to examine Dr. Uscinski on February 18 because Ms. Quagliana indeed returned to court that morning. Huguely does not contend that Ms. Quagliana was still too ill to properly examine Dr. Ucsinski on Saturday, February 18, when she returned to court.

[9] Although the right to counsel "is not explicitly set out in the Constitution of Virginia," the Supreme Court of Virginia has "held that it is nonetheless a fundamental right guaranteed to an accused by the Bill of Rights of the Constitution of Virginia."  Thomas v. Commonwealth, 260 Va. 553, 558 n.2, 539 S.E.2d 79, 82 n.2 (2000) (citing Fitzgerald v. Smyth, 194 Va. 681, 690, 74 S.E.2d 810, 815 (1953)); see Bolden v. Commonwealth, 11 Va. App. 187, 190, 397 S.E.2d 534, 536 (1990) ("An accused's right to be represented by counsel is guaranteed by both the Bill of Rights of the Virginia Constitution and the sixth amendment to the United States Constitution." (citations omitted)); see also Bennefield v. Commonwealth, 21 Va. App. 729, 739-40, 467 S.E.2d 306, 311 (1996) ("Our courts have consistently held that the protections afforded under the Virginia Constitution are co-extensive with those in the United States Constitution."); cf. Morrisette v. Commonwealth, 264 Va. 386, 394, 569 S.E.2d 47, 53 (2003); Lowe v. Commonwealth, 230 Va. 346, 348 n.1, 337 S.E.2d 273, 275 n.1 (1985).

*1. Governing Principles and Standard of Review*

The Sixth Amendment states, in pertinent part, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. "[A]n element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." Gonzalez-Lopez, 548 U.S. at 144. However, the United States Supreme Court has never held that the Sixth Amendment right to a retained counsel of choice is *absolute*. See id. (recognizing that this right "is circumscribed in several important respects" (internal quotation marks and citation omitted)); see also Wheat v. United States, 486 U.S. 153, 159 (1988) ("[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.").

On appeal, issues of constitutional interpretation are reviewed *de novo*. See Gallagher v. Commonwealth, 284 Va. 444, 449, 732 S.E.2d 22, 24 (2012); Crawford v. Commonwealth, 281 Va. 84, 97, 704 S.E.2d 107, 115 (2011). Consequently, any issues raised by Huguely in Assignment of Error I that require interpreting the Sixth Amendment or interpreting the binding case law that addresses the Sixth Amendment right to counsel must be considered *de novo* by this Court. However, as the Supreme Court also explained in Morris v. Slappy, 461 U.S. 1 (1983):

> Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel.

Id. at 11-12 (quoting Ungar v. Sarafite, 376 U.S. 575, 589 (1964)); see also Johnson v. Commonwealth, 51 Va. App. 369, 374, 657 S.E.2d 812, 814 (2008).  Therefore, the United States Supreme Court has recognized that trial judges necessarily retain the discretion, when the circumstances demand, "to make scheduling and other decisions that effectively exclude a defendant's first choice of counsel."  Gonzalez-Lopez, 548 U.S. at 152; see also Morris, 461 U.S. at 11-12; Johnson, 51 Va. App. at 374, 657 S.E.2d at 814.

The Supreme Court of Virginia has explained that, "'when a decision is discretionary . . . the court has a range of choice, and . . . its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.'"  Lawlor v. Commonwealth, 285 Va. 187, 212-13, 738 S.E.2d 847, 862 (2013) (quoting Landrum v. Chippenham & Johnston-Willis Hosps., Inc., 282 Va. 346, 352, 717 S.E.2d 134, 137 (2011)).  The abuse of discretion standard is "highly deferential" to trial courts and is rooted in "'the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie.'"  Thomas v. Commonwealth, 62 Va. App. 104, 111-12, 742 S.E.2d 403, 412 (2013) (quoting Hamad v. Hamad, 61 Va. App. 593, 607, 739 S.E.2d 232, 239 (2013)).  "'Only when reasonable jurists could not differ can we say an abuse of discretion has occurred.'"  Landeck v. Commonwealth, 59 Va. App. 744, 751, 722 S.E.2d 643, 647 (2012) (quoting Grattan v. Commonwealth, 278 Va. 602, 620, 685 S.E.2d 634, 644 (2009)).

*2.  The Result in Gonzalez-Lopez Does Not Require a New Trial Here*

In Gonzalez-Lopez, 548 U.S. at 150, the United States Supreme Court held that the erroneous denial of a defendant's Sixth Amendment right to a retained attorney of choice constitutes structural error.  "[S]tructural error is reserved for the 'limited class' of errors that 'defy analysis by harmless error standards.'"  Ray v. Commonwealth, 55 Va. App. 647, 651, 688 S.E.2d 879, 881-82 (2010) (quoting Neder v. United States, 527 U.S. 1, 7 (1999)).  Put another

- 11 -

way, an "automatic reversal" is required when there is structural error. <u>Neder</u>, 527 U.S. at 8. However, no structural error exists in this case, and the decision in <u>Gonzalez-Lopez</u> does not compel a new trial here.

In short, this case is not like <u>Gonzalez-Lopez</u> because the circumstances here are very different than the circumstances in <u>Gonzalez-Lopez</u>, as we note below. Beyond such factual differences, however, the United States Supreme Court's decision in <u>Gonzalez-Lopez</u> did not squarely address *the very legal issue* that we must deal with here – i.e., specifically, how to determine whether a criminal defendant, such as Huguely, actually has been deprived of his Sixth Amendment right to representation by a retained attorney. In <u>Gonzalez-Lopez</u>, the prosecution *conceded* error on that issue, and the Supreme Court accepted that concession as appropriate without further analysis. Thus, the Supreme Court only addressed the proper *remedy* for a Sixth Amendment violation of this type of conceded structural error.

Before being entitled to the remedy of a new trial, Huguely must first show that there actually was some error that requires a new trial. <u>See</u> <u>Johnson</u>, 51 Va. App. at 376, 657 S.E.2d at 815 ("<u>Gonzalez-Lopez</u> clearly applies only to situations where a trial court *erroneously* denies a defendant his right to counsel of his choice."). As this Court explained in <u>Johnson v. Commonwealth</u>, 50 Va. App. 600, 652 S.E.2d 156 (2007), when discussing structural error under the Sixth Amendment:

> The "structural" adjective merely denotes that the violation of the right cannot be subjected to the harmless error doctrine on appeal. <u>Id.</u> Whether the right has been violated in the first place is not affected by the structural classification of the alleged violation. A constitutional defect, in other words, must first be shown to exist before its structural or nonstructural qualities become relevant.

<u>Id.</u> at 604, 652 S.E.2d at 158. Stated more simply, Huguely's argument on <u>Gonzalez-Lopez</u> here places the cart before the horse.

Neither Gonzalez-Lopez nor any other decision Huguely relies upon actually supports Huguely's claim that the trial judge committed Sixth Amendment *error* here. Those cases have significant factual differences from this case. The commonality in those cases – but not in this case – was a ruling *by a trial court* that essentially *barred* a retained attorney from representing the defendant in the first place. In Gonzalez-Lopez, 548 U.S. at 144, due to an erroneous application of the local rules of court by the trial judge in that case, one of the defendant's retained attorneys was actually prohibited from examining witnesses, arguing the case at trial, or even sitting at the counsel table – and could not even meet with the defendant until the last night of trial. In London v. Commonwealth, 49 Va. App. 230, 239, 638 S.E.2d 721, 725 (2006), the defendant's family had retained an attorney sixteen days before trial, and the trial judge was notified of that fact only four days later; however, the trial judge there nevertheless denied a continuance to permit the retained attorney to prepare for trial. In United States v. Laura, 607 F.2d 52, 54-55 (3d Cir. 1979), the trial judge erred by summarily ruling that one of the defendant's retained attorneys could not represent the defendant simply because of a perceived conflict of interest between that attorney and the trial judge. In short, the trial judge barred the defendant from the defendant's retained attorney of choice rather than deciding whether transferring the case or reassigning it to a different judge was appropriate. Id. at 57-58. Likewise, in Rodriguez v. Chandler, 492 F.3d 863, 864 (7th Cir. 2007), the trial judge there erroneously barred a retained attorney from even representing the defendant.

Here, however, the trial judge never *barred* Ms. Quagliana from representing Mr. Huguely at trial. The issue here arose due to Ms. Quagliana's untimely illness. The trial judge was simply responding to Ms. Quagliana's absence. He did not create it. Furthermore, the trial judge actually accommodated Ms. Quagliana's absence – excusing the jury during an already lengthy trial for the entire day on February 16 and for the afternoon on February 17 so

- 13 -

that Ms. Quagliana could return to examine Dr. Uscinski. It is true that Ms. Quagliana was not present when testimony was heard by the jury on the morning of February 17. However, surely the Sixth Amendment does not impose an absolute requirement, when a defendant is represented by two or more retained attorneys, that a jury trial must completely grind to a halt, as a matter of constitutional law, simply because *one* of the defendant's retained attorneys has become ill.

### 3. *No Abuse of Discretion by the Trial Judge Here*

Huguely recognizes there is language in the <u>Gonzalez-Lopez</u> decision explaining that a trial judge retains discretion "to make scheduling and other decisions that effectively exclude a defendant's first choice of counsel." <u>Gonzalez-Lopez</u>, 548 U.S. at 152. Huguely contends that the trial judge here was required to balance Huguely's right under the Sixth Amendment with the court's scheduling concerns. He argues that no such balancing occurred here.

Viewing the record in the light most favorable to the Commonwealth, however, as we must since the Commonwealth prevailed at trial, the record shows that the trial judge's decision here was reasonable. First, we note that the trial judge excused the jury for *the entire day* on Thursday, February 16, when Ms. Quagliana's illness first arose as an issue in this case. When the trial judge first learned of Ms. Quagliana's illness on the morning of February 16, he ordered a recess without any such request by Mr. Lawrence even appearing in the record. Explaining to the jury why the court was recessing until 12:30 p.m., the trial judge indicated that he hoped to proceed with the trial at that time *if* Ms. Quagliana was able to return to court by then. When it became clear that Ms. Quagliana could not return at all on February 16, Mr. Lawrence moved to adjourn until 9:00 a.m. the next day. The trial judge granted this request without at all questioning the need to adjourn at that time. The record reflects that the parties and the trial judge hoped that Ms. Quagliana would be able to return to court the next day.

- 14 -

When Ms. Quagliana was unable to attend court for a second consecutive day on Friday, February 17, 2012, the continuing nature of Ms. Quagliana's illness meant that the issue needed to be dealt with somewhat differently as her illness persisted.  The record suggests that the attorneys present and the trial judge recognized that the circumstances had changed.  Thus, Mr. Lawrence himself offered first to question those defense witnesses whom he was prepared to examine.  Mr. Lawrence then retracted this offer and moved for a continuance after speaking with Huguely during a short recess.  Mr. Lawrence suggested that there was authority stating that a defendant who has hired two lawyers has a right to have both lawyers present.  Mr. Lawrence contended that this right "probably" exists, although he was vague concerning the source of authority for his contention.  Mr. Lawrence's argument in support of the motion instead essentially concerned Huguely's level of comfort with having both of his attorneys present.  Furthermore, even as he sought a continuance, Mr. Lawrence still acknowledged the Commonwealth's interests and expressed "sympathy" for "the stress" put on the Commonwealth "by these delays" resulting from Ms. Quagliana's illness.  Moreover, Mr. Lawrence also candidly represented to the trial judge that he still felt capable of examining the defense witnesses whom he had initially offered to examine that morning.

As an appellate court, "we do not substitute our judgment for that of the trial court" when a matter is discretionary and we "consider only whether the record fairly supports the trial court's action."  Beck v. Commonwealth, 253 Va. 373, 385, 484 S.E.2d 898, 906 (1997).  Based on the totality of the circumstances here, we hold that the trial judge's decision to proceed with the examination of defense witnesses by Mr. Lawrence on February 17, 2012 must be affirmed because it was supported by the record on appeal.  Id.  The record supports a conclusion that the trial judge thoughtfully considered Huguely's right to Ms. Quagliana's presence in the courtroom against other concerns that Mr. Lawrence himself recognized – i.e., the need to proceed with the

trial in a timely manner and Mr. Lawrence's ability to examine those witnesses he was already prepared to examine.

In support of this conclusion, we rely on the United States Supreme Court's own explanation in Gonzalez-Lopez of why the erroneous deprivation of a defendant's Sixth Amendment right to the retained counsel of choice is so significant that it constitutes structural error defying the normal harmless error review. The Supreme Court there discussed the many aspects of a criminal case that might be handled differently depending on a defendant's choice of retained counsel, which includes (in the words of the Supreme Court in Gonzalez-Lopez):

- "investigation and discovery";

- "development of the theory of defense";

- "selection of the jury";

- "presentation of the witnesses";

- "style of witness examination";

- "jury argument";

- "whether and on what terms the defendant cooperates with the prosecution";

- "plea bargains"; and

- "the framework within which the trial proceeds" – or "whether it proceeds at all."

Gonzalez-Lopez, 548 U.S. at 150 (internal quotation marks and citations omitted).

Almost none of these considerations apply to Ms. Quagliana's absence in this case while she was ill.[10] Furthermore, while the examination of some defense witnesses proceeded in

---

[10] Indeed, before Ms. Quagliana ever became ill, the following events transpired: The parties had already conducted their investigations of the case, discovery had occurred, and it became clear that the matter would proceed to trial without a plea bargain. A theory of defense had been identified and developed. The jury had been selected and seated. Opening arguments had been delivered. The Commonwealth had examined its witnesses and concluded its case-in-chief – with Ms. Quagliana present for the cross-examination of each of the

Ms. Quagliana's absence, Mr. Lawrence represented to the trial judge that he was prepared to examine those witnesses – and he actually reaffirmed this representation even after seeking a continuance on Huguely's behalf. See Morris, 461 U.S. at 12 ("In the face of the unequivocal and uncontradicted statement by a responsible officer of the court that he was fully prepared and 'ready' for trial, it was far from an abuse of discretion to deny a continuance. On this record, it would have been remarkable had the trial court not accepted counsel's assurances."). There is no indication that Ms. Quagliana's absence had a meaningful effect on the style or manner in which those defense witnesses were examined by defense counsel. Indeed, it appears from the record that Mr. Lawrence would have been the retained defense attorney examining those witnesses[11] even if Ms. Quagliana had been present in court on the morning of February 17. Given all of the circumstances in the record of this case, the nature of Ms. Quagliana's absence from the trial was not so pervasive as to render its effect essentially unquantifiable and thereby create structural error under the United States Supreme Court's application of the Sixth Amendment. See

---

Commonwealth's witnesses. The defense had begun its case-in-chief. Ms. Quagliana had examined Dr. Leestma, one of the defense's experts. Only then did Ms. Quagliana become ill. While Mr. Lawrence examined defense witnesses in her absence on the morning of February 17, the record establishes that Ms. Quagliana was not left in the dark about the substance of that testimony, since she had access to an "unofficial transcript" of the proceedings in order to review those witnesses' testimony despite her absence from the courtroom. It is undisputed that Ms. Quagliana then returned to court while the defense's case-in-chief was still ongoing, examined Dr. Uscinski as part of the defense's case, was present for the Commonwealth's rebuttal evidence and the closing arguments to the jury, and actually delivered the argument on Huguely's behalf during the sentencing phase of trial.

[11] It appears from the record that Mr. Lawrence actually was the attorney responsible for examining the witnesses who testified on the morning of February 17. In response to Huguely's motion to set aside the verdicts, the Commonwealth claimed that "Mr. Lawrence examined only those witnesses for whom he advised the Court he was responsible for and prepared" to examine that day. The reply brief in support of the motion to set aside the verdict prepared by Huguely's trial attorneys appeared to accept the Commonwealth's claim that Mr. Lawrence was responsible for examining those witnesses – while also asserting that "the prosecution does not get to dictate how the defense allocates its responsibilities" and that Huguely was entitled to the presence of both attorneys "regardless of which attorney was responsible for the examination of any particular witness."

<u>Gonzalez-Lopez</u>, 548 U.S. at 150 (when the Supreme Court said, after the government conceded Sixth Amendment error, "It is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings.").

Simply put, the trial judge here did not display an "*unreasoning and arbitrary* insistence upon expeditiousness in the face of a justifiable request for delay."  <u>Morris</u>, 461 U.S. at 11-12 (emphasis added).  The trial judge certainly did not arbitrarily disregard Huguely's right to Ms. Quagliana's presence at trial.  Given the way the trial court handled Ms. Quagliana's absence, it appears that he actually gave the request to have Ms. Quagliana present in the courtroom significantly *greater* weight than the other concerns which he had to consider.  As a result, the trial judge excused the jury for the entire day of February 16 and for the afternoon of February 17.  However, the trial judge was also entitled to find that Ms. Quagliana's presence at trial did not necessarily outweigh any and every other concern at all times.  This is especially true since Huguely was represented by two retained attorneys of equal authority – one of whom was still in the courtroom and assuring the court that he felt comfortable with examining witnesses that he was prepared to examine and would have examined anyway.  Otherwise, we would be obligated to hold as a matter of law that Ms. Quagliana's illness completely bound the trial judge's hands and required that the trial come to a standstill for a second consecutive day.  That holding would remove any discretion from the trial judge – which would contradict established case law interpreting the Sixth Amendment.[12]  <u>See</u> <u>Gonzalez-Lopez</u>, 548 U.S. at 152; <u>Morris</u>, 461 U.S. at 11-12; <u>Johnson</u>, 51 Va. App. at 374, 657 S.E.2d at 814.

---

[12] Moreover, we disagree with Huguely's argument in the alternative that the trial judge's ruling disrupted the defense's strategy to the extent that reversible error occurred even absent structural error under the Sixth Amendment.  While the trial judge's ruling on the morning of February 17 may have resulted in the defense's witnesses being called in a different order than defense counsel preferred, "[t]he rule is well established in Virginia that 'great latitude [will be

- 18 -

Based on our review of the record, the trial judge only ordered the trial to proceed in Ms. Quagliana's absence when doing so had the least impact on her role as co-counsel at trial. Especially given the uncertainty of when Ms. Quagliana actually would return to court, we cannot say that the trial judge abused his discretion. Huguely was not *erroneously* deprived of his Sixth Amendment right. See Johnson, 51 Va. App. at 376, 657 S.E.2d at 815. Accordingly, despite Huguely's request for a new murder trial on this basis, a new trial simply is not required under the circumstances of this case.

### B. ASSIGNMENT OF ERROR II(A) – *VOIR DIRE* QUESTION[13]

In Assignment of Error II(A), Huguely argues that the trial judge erred by deciding during *voir dire* that defense counsel could not ask the remaining prospective jurors the following question:

> If [the] defense offered testimony about Ms. Love's consumption of alcohol or uncomplimentary testimony about her behavior to explain the nature of her relationship with Mr. Huguely and his motives, would that cause you to think that we were blaming or attacking Ms. Love?

The trial judge explained his ruling by stating, "I don't think the question is really a helpful one because I think it all has to do with what the evidence actually shows, and I think without them knowing what the evidence shows, it's hard for them to know whether or not it's going to appear to be blaming the victim or not."

_____

given] to the discretion of the trial [judge] as to the order in which witnesses may be called and the manner of their examination.'" Whitehead v. Commonwealth, 31 Va. App. 311, 318, 522 S.E.2d 904, 907 (2000) (quoting Butler v. Parrocha, 186 Va. 426, 433, 43 S.E.2d 1, 5 (1947)). In addition, we disagree with Huguely's argument on appeal that his second-degree murder conviction must be reversed and the matter remanded for a new trial due to his claim that some jurors might not have viewed Ms. Quagliana as a co-equal counsel when the trial proceeded without her presence on the morning of February 17.

[13] In Assignments of Error II(A) and II(B), Huguely contends that he was denied his right to an impartial jury under the Sixth Amendment of the United States Constitution and under the Virginia Constitution.

In other words, the trial judge found that the nature of the question was too conditional to satisfy the purpose of jury selection. As the trial judge commented in denying a somewhat rephrased version of the question proposed by defense counsel,[14] this line of questioning went "into the merits of the defense" that would actually be presented at trial.

### 1. The Question Was Not Required Under Code § 8.01-358

The Supreme Court has held that a criminal defendant "does not have an unlimited constitutional or statutory right to propound any question to a jury panel." Commonwealth v. Hill, 264 Va. 315, 319, 568 S.E.2d 673, 675 (2002). Rather, "the questions propounded during *voir dire* must be relevant to the factors prescribed in Code § 8.01-358." Id. Code § 8.01-358 states, in pertinent part, that the trial court and the attorneys for either party "shall have the right to ask [a prospective juror] directly any relevant question to ascertain whether he is *related to either party*, or has any *interest in the cause*, or has *expressed or formed any opinion*, or is *sensible of any bias or prejudice* therein . . . ." (Emphasis added).

> "The test of relevancy is whether the questions relate to any of the four criteria set forth in the statute. If an answer to the question would necessarily disclose, or clearly lead to the disclosure of the statutory factors of relationship, interest, opinion, or prejudice, it must be permitted. Questions which go beyond this standard are entirely within the trial court's discretion."

Hill, 264 Va. at 319, 568 S.E.2d at 675 (quoting Davis v. Sykes, 202 Va. 952, 121 S.E.2d 513 (1961)); see Ristaino v. Ross, 424 U.S. 589, 594-95 (1976) ("V*oir dire* is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion."

---

[14] Defense counsel proposed asking the remaining prospective jurors:

> [W]ould you have any difficulty listening to testimony about the behavior of victims such as drinking to excess, physical aggressiveness, use of bad or foul language or sexual behavior as it became relevant to explain the relationship between Mr. Huguely and Ms. Love, and would you form a negative impression of Mr. Huguely as a defendant for bringing up the subject?

(internal quotation marks and citation omitted)); <u>United States v. Lancaster</u>, 96 F.3d 734, 739 (4th Cir. 1996) ("Part and parcel of deference to the trial court's conduct of *voir dire* is a reluctance to second-guess the court's decision to refuse inquiry into certain matters."). Stated another way, the Supreme Court has explained, "A party has no right, statutory or otherwise, to propound any question he wishes, or to extend *voir dire* questioning *ad infinitum*." <u>LeVasseur v. Commonwealth</u>, 225 Va. 564, 581, 304 S.E.2d 644, 653 (1983).

Applying these principles, we hold that the question that Huguely wished to pose to the prospective jurors was not required for purposes of *voir dire* because it did not relate to the four factors stated in Code § 8.01-358. First, the question would not reveal whether a prospective juror was related to the parties. Second, the question would not reveal whether a prospective juror had an interest in the case. Third, the question would not reveal whether a prospective juror had expressed or formed an opinion about the case. Fourth, the question would not reveal whether a prospective juror was "sensible of any bias or prejudice" that would affect the juror's ability to render a fair verdict. Code § 8.01-358. Furthermore, as the trial judge ruled, a juror could not accurately answer the question until he saw how the defense actually presented its evidence at trial. And so the question could not reveal any bias or prejudice on the juror's part – or anything that would relate to any of the other criteria before the trial began.

While the trial judge may have initially approved the use of this question by Huguely's counsel, it did so before *voir dire* – before the trial judge could observe the question being posed in practice.[15] Nothing prevented the trial judge from reconsidering his earlier decision. The trial judge's later ruling that the question was inappropriate for *voir dire* certainly did not constitute an abuse of discretion – given that the question was not relevant under any of the factors stated in Code § 8.01-358.

---

[15] During earlier *voir dire* questioning of the pool of jurors, defense counsel failed to ask the supposedly crucial question to a number of prospective jurors.

## 2. *Juror 34's Responses Do Not Prove the Question's Relevance*

Contrary to Huguely's argument on appeal, the trial judge's decision to strike Juror 34 from the venire does not prove the relevance of Huguely's *voir dire* question about blaming the victim. Juror 34 did *not* state during *voir dire* that he would feel as though the defense was blaming the victim if the defense offered evidence that was uncomplimentary of Love. Instead, Juror 34 said that his response *would depend on how the evidence was presented*. Several times during *voir dire*, Juror 34 conveyed the conditional nature of his response, explaining:

> If you presented it in a mean or accusatory way trying to put all the blame on her, you know, then I might.

> \* \* \* \* \* \* \*

> Well, if you were mean about it instead of just presenting facts, you could turn me over to the other side.

> \* \* \* \* \* \* \*

> I don't think [my view of the case would be affected] so as long as you presented the facts in a dignified manner instead of . . . in an angry manner.

Furthermore, Juror 34 told Huguely's attorney that his concern that the facts be presented in a dignified manner would not affect his sense of impartiality or neutrality.

In addition, Juror 34 clarified his view even more while responding to the trial judge's questioning. The trial judge asked, "Would your displeasure be shared between the sides equally if you felt that one side or the other was presenting what they were presenting in an angry [manner] or a manner that you felt was inappropriate?" Juror 34 replied, "I think so." Juror 34 then agreed with the trial judge's observation that it seemed as though Juror 34's potentially negative reaction to an angry or undignified presentation of evidence "would go against both" parties "either way."

In short, Juror 34's responses indicated that he might react negatively if a party's attorney seemed *angry or undignified*. His responses did not necessarily concern how he would react if the defense presented evidence that was uncomplimentary of Love – without also doing so in an angry or undignified manner. The responses of Juror 34 reflected the ambiguity inherent in defense counsel's question. See Buchanan v. Commonwealth, 238 Va. 389, 401, 384 S.E.2d 757, 764 (1989) ("Further, trial courts are not required to allow counsel to ask questions which are so ambiguous as to render the answers meaningless."). As Juror 34 himself said, the answer to the defense's *voir dire* question would depend "on how [that evidence] was presented."

The trial judge ultimately granted Huguely's motion to strike Juror 34 for cause, but the trial judge appeared to do so mainly because the Commonwealth decided not to oppose the motion. Nevertheless, the trial judge also recognized the conditional nature of Juror 34's responses – remarking that Juror 34 seemed to "qualify" his responses by disapproving of anything done at trial in an "angry" manner. Based on our review of the transcript of Juror 34's *voir dire*, the trial judge's assessment here was reasonable and further refutes Huguely's contention that the trial judge was required to permit the *voir dire* question.

Therefore, the trial judge did not abuse his discretion when he ruled after the *voir dire* of Juror 34 that the defense's line of questioning about blaming the victim was not an appropriate topic for *voir dire.*

C. ASSIGNMENT OF ERROR II(B) – MOTIONS TO STRIKE PROSPECTIVE JURORS FOR CAUSE

In Assignment of Error II(B), Huguely argues that the trial judge committed reversible error when the judge declined motions to strike several prospective jurors from the venire. See Breeden v. Commonwealth, 217 Va. 297, 300, 227 S.E.2d 734, 736-37 (1976) (holding that a criminal defendant cannot be forced to use peremptory strikes on jurors who should have been

stricken for cause). Huguely contends that these prospective jurors' "answers during *voir dire* raised serious doubts about their ability to remain impartial."

*1. General Principles and Standard of Review*

Code § 8.01-358 states, in pertinent part, "[I]f it shall appear to the court that the juror does not stand indifferent in the cause, another shall be drawn or called and placed in his stead for the trial of that case." Thus, "[i]f a prospective juror 'does not stand indifferent to the cause, he is not competent. If he has any interest in the cause, or is related to either party, or has expressed or formed any opinion, or is sensible of any bias or prejudice, he is excluded by the law.'" Lovos-Rivas v. Commonwealth, 58 Va. App. 55, 60-61, 707 S.E.2d 27, 30 (2011) (quoting Spangler v. Ashwell, 116 Va. 992, 996-97, 83 S.E. 930, 931 (1914)).

The Supreme Court has explained, "The opinion entertained by a juror, which disqualifies him, is an opinion of that fixed character which repels the presumption of innocence in a criminal case, and in whose mind the accused stands condemned already." Justus v. Commonwealth, 220 Va. 971, 976, 266 S.E.2d 87, 91 (1980); see Griffin v. Commonwealth, 19 Va. App. 619, 621, 454 S.E.2d 363, 364 (1995) (explaining that "the test of impartiality is whether the venireperson can lay aside the preconceived views and render a verdict based solely on the law and evidence presented at trial").

> Given that the trial court is "'able to see and hear each member of the venire respond to questions posed'" during *voir dire*, it "'is in a superior position to determine whether a prospective juror's responses during *voir dire* indicate that the juror would be prevented from or impaired in performing the duties of a juror as required by the court's instructions and the juror's oath.'" Townsend v. Commonwealth, 270 Va. 325, 329, 619 S.E.2d 71, 73 (2005) (quoting Green v. Commonwealth, 262 Va. 105, 115-16, 546 S.E.2d 446, 451 (2001)). Juror impartiality is a question of fact, see Wainwright v. Witt, 469 U.S. 412, 428 (1985), and a trial court's decision to seat a juror is entitled to great deference on appeal, see McGill v. Commonwealth, 10 Va. App. 237, 241, 391 S.E.2d 597, 600 (1990). Accordingly, the decision to retain or exclude a prospective juror "will not be disturbed on appeal unless

- 24 -

> there has been manifest error amounting to an abuse of discretion." Barrett v. Commonwealth, 262 Va. 823, 826, 553 S.E.2d 731, 732 (2001).

Lovos-Rivas, 58 Va. App. at 61-62, 707 S.E.2d at 30.  Furthermore, we must consider the

"'entire *voir dire*, not just isolated portions.'"  Juniper v. Commonwealth, 271 Va. 362, 401, 626

S.E.2d 383, 408 (2006) (quoting Jackson v. Commonwealth, 267 Va. 178, 191, 590 S.E.2d 520,

527 (2004)).

## 2.  *Juror 32*

On brief, Huguely contends that the "most glaring error" made by the trial judge during

*voir dire* of the prospective jurors involved Juror 32.  Huguely relies in large part on the fact that

Juror 32 indicated in the juror questionnaire that she felt that Huguely was guilty based on

conversations with others and based on the media reports that she had seen.  However, that does

not tell the entire story, as reflected in the entire record from the questionnaire and the *voir dire*.

Juror 32 also wrote by hand, "Do have an open mind!"  Juror 32 indicated further on the

questionnaire that she was unsure whether she had formed an opinion about the accuracy or truth

of the media reports that she had seen about the case.  By the time of *voir dire*, Juror 32 denied

having formed an opinion as to Huguely's guilt or innocence and explained that she could make

a decision based on the facts.

The Supreme Court's decision in Briley v. Commonwealth, 222 Va. 180, 279 S.E.2d 151

(1981), guides our analysis of Juror 32.  Briley – like this case – attracted considerable media

attention.  Id. at 181, 279 S.E.2d at 152.  In light of the extensive media coverage of that case,

prospective jurors were asked if they believed Briley was guilty.  One prospective juror

responded, "I really couldn't . . . say my opinion but *right now my opinion is that he is guilty . . .*

but I can't really say until I hear the case."  Id. at 182, 279 S.E.2d at 152 (emphasis added).

Another replied, "Well, I think it looks pretty bad for him . . . from what I've seen and read in the

paper, I mean it – I wouldn't judge it on that basis but it looks pretty bad, I think." Id. That

second prospective juror continued, "Well, I can't see how all of the information that has been

given in the papers and it's gone through the Grand Jury and has gotten to this point if there

wasn't some guilt there," also adding that he did not consider it "likely" that Briley could be not

guilty. Id. The Supreme Court affirmed Briley's convictions – disagreeing with Briley's

argument that these prospective jurors made a "pre-determination of guilt" that disqualified them

from sitting on the jury. Id.

The Supreme Court in Briley expressed several principles that apply here. First, the

Supreme Court rejected Briley's assertion that prospective jurors who have "formed an opinion

from what they had read and heard in news accounts" simply "can never qualify" as impartial

jurors. Id. at 184, 279 S.E.2d at 154. Instead, the Supreme Court noted,

> "In these days of swift, widespread and diverse methods of
> communication, an important case can be expected to arouse the
> interest of the public in the vicinity, and scarcely any of those best
> qualified to serve as jurors will not have formed some impression
> or opinion as to the merits of the case."

Id. at 186, 279 S.E.2d at 154 (quoting Irvin v. Dowd, 366 U.S. 717, 722 (1961)). Second, the

Supreme Court differentiated between "a casual impression" that does not necessarily disqualify

a prospective juror and "a fixed and abiding conviction" that must disqualify a prospective juror.

Id. at 185, 279 S.E.2d at 154; see Griffin, 19 Va. App. at 621, 454 S.E.2d at 364 ("It is not

uncommon to discover during *voir dire* that prospective jurors have preconceived notions,

opinions, or misconceptions about the criminal justice system, criminal trials and procedure, or

about the particular case."). And third, the Supreme Court emphasized that the prospective

juror's entire *voir dire* must be considered – not just isolated portions.[16] See Briley, 222 Va. at

---

[16] The Supreme Court actually addressed a fourth principle in Briley – that a prospective
juror may not be rehabilitated through leading questions. Although Huguely argues on appeal
that Juror 32 was improperly rehabilitated, the record does not show that this argument was

- 26 -

186, 279 S.E.2d at 155 (noting that, in <u>Murphy v. Florida</u>, 421 U.S. 794, 802 (1975), a prospective juror did not need to be struck for cause, even though he acknowledged that "right now I would find [the defendant] guilty," since the *voir dire* transcript also revealed other "indicia of impartiality").

With these principles in mind, we hold that the trial judge's decision not to strike Juror 32 for cause was not manifest error amounting to an abuse of discretion. <u>See</u> <u>Barrett</u>, 262 Va. at 826, 553 S.E.2d at 732. While the responses by Juror 32 in the jury questionnaire were somewhat in tension, she did indicate plainly and emphatically in her own handwriting, "Do have an open mind!" Furthermore, during the actual *voir dire* – when the trial judge could actually observe her responses and demeanor – Juror 32 made several statements supporting a finding that she could be an impartial juror with an open mind. Noting that there are two sides to a story, Juror 32 said she would withhold judgment "until I've heard the ifs and ands on what happened, you know." Juror 32 further alleviated concerns that she had prejudged the case by pointing out that "the actual individual does not get all the facts through the media" and also by stating that, "if I didn't feel factually that I had been shown that he was guilty, then, you know, no, I would not" find Huguely guilty. Based on these responses, and in light of the Supreme Court's decision in <u>Briley</u>, the decision not to strike Juror 32 for cause was not reversible error.

---

preserved in the trial court during the motion to strike Juror 32 for cause. <u>See</u> Rule 5A:18; <u>see also</u> <u>Brown v. Commonwealth</u>, 279 Va. 210, 217, 688 S.E.2d 185, 188 (2010) ("Rule 5A:18 requires a litigant to make timely and specific objections, so that the trial court has an opportunity to rule intelligently on the issues presented, thus avoiding unnecessary appeals and reversals." (internal quotation marks and citation omitted)); <u>Schmitt v. Commonwealth</u>, 262 Va. 127, 142, 547 S.E.2d 186, 197 (2001) (explaining that, for objections relating to the *voir dire* of prospective jurors to be timely, the trial judge must be given "a timely opportunity to rule on the merits of such objections and to take any necessary corrective action"). For the same reason, Huguely also did not preserve in the trial court his argument on appeal that certain *voir dire* responses by Juror 32 were too equivocal to establish her impartiality.

*3. Juror 35*

Huguely argues that Juror 35 should have been struck for cause because Juror 35 is an employee of the University of Virginia, because Juror 35 felt that Huguely's case placed the University of Virginia in a bad light, and because he believes that male athletes are violent. Huguely also contends that several of Juror 35's responses during *voir dire* were equivocal.

Juror 35 said during *voir dire* that the case was "widely discussed" at the university, acknowledged that he had been involved in "my share" of casual discussions about it with colleagues, and opined that "it would be better if we [made] the news with another Nobel prize or something." When asked whether he could explain a "not guilty" verdict to his colleagues, Juror 35 replied, "I think I can handle it." Similarly, when asked whether he would "have any reluctance at all to return a not guilty verdict given the impact this case has had on the University of Virginia, the fact that it's generated bad publicity for them," Juror 35 said, "No, I think I could take it on the evidence as it is."

Huguely seizes on Juror 35's use of the word, "think," characterizing Juror 35's responses as too equivocal to ensure his impartiality and indifference to the cause. However, the Supreme Court has observed that the word "think" can have different meanings depending on one's demeanor, emphasis, and tone of voice – and has held that such contextual determinations must be made by the trial court during *voir dire*. Weeks v. Commonwealth, 248 Va. 460, 475, 450 S.E.2d 379, 389 (1994). Furthermore, the cases upon which Huguely relies in support of his argument that Juror 35 was too equivocal are distinguishable from this case. Specifically, in those cases, the prospective jurors who gave equivocal responses all acknowledged a personal connection to the nature of the criminal offense being prosecuted. See Clements v. Commonwealth, 21 Va. App. 386, 391, 464 S.E.2d 534, 537 (1995) (in a forcible sodomy case, the prospective juror had a relative who had been a victim of sexual assault, leaving him

"[s]lightly" predisposed against people charged with sexual offenses); Brown v. Commonwealth, 29 Va. App. 199, 204, 510 S.E.2d 751, 753 (1999) (in a rape case, the prospective juror, who had been the victim of an attempted abduction and possible sexual assault, did not "honestly know" whether this experience would leave her with a bias against the accused); Moten v. Commonwealth, 14 Va. App. 956, 957, 420 S.E.2d 250, 251 (1992) (in a drug case, the prospective juror said that her husband was a recovering addict and that drugs were a "touchy" subject for her). By contrast, the record does not establish that Juror 35 or any of his loved ones had been the victim of a violent crime. Moreover, the record discloses several *voir dire* responses by Juror 35 that were not equivocal.

In addition, the trial judge was not required to strike Juror 35 for cause based on Juror 35's stated opinions about male athletes. During *voir dire*, Juror 35 clarified his questionnaire response on that subject and asserted a belief that male athletes are not *inherently* violent. Instead, he said he believed only that violence can result due to the competitive environment of athletics. The record shows that defense counsel asked Juror 35, "Is your predisposition . . . that men who are athletes are more likely to be violent people or less violent people?" Juror 35 responded:

> I think they're about the same. I think they're sort of the same as everyone else. I think they're put in situations---they're deliberately put in situations where they're competitive and they sort of thrive on that.

Juror 35 added, "[T]he games are violent." Juror 35 never actually said that male athletes themselves were more inherently disposed by their nature to violence off the playing field.

On this record, we cannot say that *no* reasonable jurist would agree with the trial judge that Juror 35 was competent to serve as a juror here. See Grattan, 278 Va. at 620, 685 S.E.2d at 644. Accordingly, the trial judge did not abuse his discretion when he declined to strike Juror 35 for cause.

- 29 -

*4. Juror 182*

With respect to Juror 182, Huguely notes that this juror made a comment during *voir dire* that the area of Charlottesville near Love's apartment was "a dangerous place to be."[17] However, during questioning by defense counsel, Juror 182 clarified that he only meant this comment in the sense that "someone lost their life." Juror 182 added, "I'm not speaking to the facts of the case except for the fact that a death happened. There's no---that is a fact but it doesn't really have anything to do with guilt or innocence." As the trial judge found, Juror 182 did not form an opinion that would disqualify him as a juror. Therefore, the trial judge certainly did not commit manifest error by declining to strike Juror 182 for cause. See Barrett, 262 Va. at 826, 553 S.E.2d at 732.

*5. Juror 211*

Huguely moved to strike Juror 211 based on her affiliation with the University of Virginia, including the fact that one of Love's friends was enrolled in a class taught by Juror 211 at the time of Love's death. Juror 211 stated during *voir dire* that she helped the student to get a postponement of the final exam so that the student could attend Love's funeral. However, Juror 211 also stated that she did not know Love's friend well at all – adding that she was mortified because she could not even remember the name of the student during *voir dire*. Juror 211 asserted plainly that having Love's friend in her class "has not" had any impact on how she viewed Huguely's case and also denied that her status as an employee of the university would affect her view of the case. In response to the following question by defense counsel, Juror 211 replied:

---

[17] Huguely also points on appeal to Juror 182's statements during *voir dire* indicating that he was sensitive to domestic violence issues because of a family member who had been a victim of domestic violence and also acknowledging that he was a University of Virginia employee. However, defense counsel did not identify these issues in the motion to strike Juror 182. See Rule 5A:18.

Q: Was there anything about anything that's gone on at the university with respect to this case, including information you've received, e-mails you've received, information you received from [University of Virginia President] Teresa Sullivan, any of those things, that has caused you to form any opinions or understanding or sympathies or anything of that nature?

A: Not at all, no. I read the memos but I did not participate in any of the activities.

Defense counsel sought to strike Juror 211 "just for the record," and the trial judge denied this request, finding that "there's not a shred of indication that this juror cannot be objective." We must defer to the trial judge's finding because it was not plainly wrong or unsupported by the record. See Lovos-Rivas, 58 Va. App. at 61-62, 707 S.E.2d at 30.

*6. Jurors 36 & 72*

In arguing that Jurors 36 and 72 should have been struck for cause, Huguely relies on their statements concerning excessive consumption of alcohol. However, both prospective jurors said that their views would not affect their judgment in this case. Juror 36 denied believing that evidence of Huguely's drinking would make him "more blameworthy" in Juror 36's view and also saw "no problem" with applying the trial judge's instructions. Juror 72 called the use of alcohol "unfortunate" and said that a close family member had suffered a serious injury due to the effects of being intoxicated. However, she said, "I don't think my viewing it as something of consequence would blind me to information or prejudice me against facts." Juror 72 did not express any reservations about applying the law as instructed by the trial judge.

Accordingly, based on our review of the voluminous pages of the transcript devoted to jury selection, we do not detect any abuse of discretion by the trial judge that occurred during *voir dire* with regard to Jurors 32, 35, 36, 72, 182, or 211.

- 31 -

In Assignment of Error III, Huguely argues that the trial judge erred when he refused Huguely's proposed jury instruction concerning malice. Huguely's proposed jury instruction would have added language to the jury instruction offered by the Commonwealth. Huguely's entire proposed jury instruction is quoted below – with the language he sought to add to the Commonwealth's instruction italicized:

> Malice is that state of mind which results in the intentional doing of a wrongful act to another without legal excuse or justification, at a time when the mind of the actor is under the control of reason. Malice may result from any unlawful or unjustifiable motive, including anger, hatred or revenge. *It is not confined to ill will to any one or more particular persons, but is intended to denote an action flowing from a wicked or corrupt motive, done with an evil mind and purpose and wrongful intention, where the act has been attended with such circumstances as to carry in them the plain indication of a heart regardless of social duty and fatally bent on mischief.* Malice may be inferred from any deliberate, willful, and cruel act against another, however sudden.

The law governing review of this assignment of error is settled. "'A reviewing court's responsibility in reviewing jury instructions is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" Chapman v. Commonwealth, 56 Va. App. 725, 735, 697 S.E.2d 20, 26 (2010) (quoting Chibikom v. Commonwealth, 54 Va. App. 422, 425, 680 S.E.2d 295, 296 (2009)); see Hancock-Underwood v. Knight, 277 Va. 127, 131, 670 S.E.2d 720, 722 (2009) ("Whether the content of the instruction is an accurate statement of the relevant legal principles is a question of law that, like all questions of law [is] review[ed] *de novo*."). A trial court "has broad discretion over whether to give or deny proposed jury instructions." Chapman, 56 Va. App. at 736, 697 S.E.2d at 26.

Here, the trial judge without question provided the jury an accurate instruction addressing malice. The instruction offered by the Commonwealth, which the trial judge accepted and read to the jury, has been approved by the Supreme Court of Virginia and is a model jury instruction

on malice.  See Thomas v. Commonwealth, 279 Va. 131, 160-61, 688 S.E.2d 220, 236-37

(2010); Model Jury Instruction No. 33.220.  The jury was correctly instructed on malice.

Huguely argues that the language he wanted added to the Commonwealth's instruction is

an accurate statement of the law as well and should have been given to the jury.  However, the

trial judge did not abuse his discretion by declining to use Huguely's instruction.  "When granted

instructions fully and fairly cover a principle of law, a trial court does not abuse its discretion in

refusing another instruction relating to the same legal principle."  Stockton v. Commonwealth,

227 Va. 124, 145, 314 S.E.2d 371, 384 (1984) (citing Lincoln v. Commonwealth, 217 Va. 370,

375, 228 S.E.2d 688, 691-92 (1976)).  This principle is well established in Virginia.  See also,

e.g., Eaton v. Commonwealth, 240 Va. 236, 255, 397 S.E.2d 385, 396 (1990) (holding that the

trial court did not abuse its discretion "in refusing to grant another, duplicative instruction");

Gaines v. Commonwealth, 39 Va. App. 562, 568, 574 S.E.2d 775, 778 (2003) (en banc) ("The

defendant's instruction was no more or less correct than the instruction given.  While it 'was a

correct statement of the legal principles involved and the trial court, in its discretion, could

properly have given the instruction, it does not follow that it was reversible error to refuse it.'"

(quoting Lincoln, 217 Va. at 375, 228 S.E.2d at 692)).[18]

---

[18] If anything, even viewing the facts pertaining to this assignment of error in the light
most favorable to Huguely, as we must since he was the proponent of the rejected jury
instruction, the jury instruction actually given by the trial judge better reflected the evidence
admitted at trial.  Huguely and Love clearly had a tumultuous and sometimes acrimonious
romantic relationship that had deteriorated badly by the night of May 2, 2010.  Huguely even
told Love in an April 30, 2010 email, "I should have killed you."  Any finding of malice on
Huguely's part with regard to Love would be based on his existing anger toward Love at the time
he killed her.  Anger was a component of the Commonwealth's malice instruction that the trial
judge accepted.  By contrast, Huguely's additional language – which explains that malice is "not
confined to ill will" – would not necessarily conform to the facts of this case.  The evidence
actually established Huguely's ill will toward Love, so Huguely's additional language would not
necessarily have been helpful to the factfinder.  Huguely's expanded language often applies to
situations unlike this case, where the defendant is not necessarily familiar with the victim but
nevertheless acts violently toward the victim in a way that might defy explanation.  See Thomas
v. Commonwealth, 186 Va. 131, 140, 41 S.E.2d 476, 480 (1947) ("[T]he law is not impotent to

Accordingly, the trial judge here did not abuse his "broad discretion over whether to give or deny proposed jury instructions." <u>Chapman</u>, 56 Va. App. at 736, 697 S.E.2d at 26. Consequently, we need not address the Commonwealth's alternative argument that the evidence supporting a finding that Huguely acted with malice was so strong as to render harmless any error resulting from the trial judge's decision not to adopt Huguely's proposed jury instruction.

### III. CONCLUSION

For the reasons noted *supra*, the trial judge did not erroneously deny Huguely's right to counsel under the Sixth Amendment or the Virginia Constitution. Furthermore, the trial judge did not err during *voir dire*. Moreover, the trial judge did not abuse his discretion in declining to adopt Huguely's longer proposed jury instruction addressing malice. Accordingly, we affirm Huguely's conviction for second-degree murder.

<u>Affirmed.</u>

---

impose punishment to fit the crime because explanation of the abnormal act is not given."); <u>see also</u> <u>Fletcher v. Commonwealth</u>, 209 Va. 636, 637-39, 166 S.E.2d 269, 271-72 (1969) (where no personal relationship between the defendant and the victims was mentioned).